UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

JOANNA V. PARKER f/b/o
JOANNE PARKER,

                      Plaintiff,

-vs-                                           Case No. 6:04-cv-855-Orl-JGG

JOANNE B. BARNHART,
Commissioner of Social Security,

                      Defendant.

_____/

## MEMORANDUM OF DECISION

On behalf of her daughter, Joanne Parker ["Joanne"], plaintiff Joanna V. Parker ["Parker"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying her application for Supplemental Security Income.  R. 12.  For the reasons set forth below, the Commissioner's decision is **REMANDED**.

### I.      PROCEDURAL HISTORY

On March 19, 2001, Parker protectively filed an application for supplemental security income benefits, claiming disability on the part of her daughter, Joanne, as of April 20, 1996.  R. 12, 14.  Joanne was born on September 20, 1991.  R. 141.  The application was denied initially and upon reconsideration.  R. 27 - 28, 33 - 35.  On November 5, 2003, the Honorable Apolo Garcia, Administrative Law Judge ["ALJ"], held a 30-minute hearing on Parker's claim in Orlando,

-1-

Florida.  R. 162 - 183.  The ALJ heard testimony from both Parker and her daughter.  R. 163.

Parker was not represented by counsel at the hearing.  R. 12.

On October 15, 2003, the ALJ issued his decision that Parker was not entitled to

Supplemental Security Income.  R. 21.  Following a review of the medical and other record

evidence, the ALJ found that Joanne suffered from attention deficit hyperactivity disorder

["ADHD"] and oppositional defiant disorder, but that these disorders caused no more than

minimal functional limitations, and did not meet, medically equal, or functionally equal any

impairment in the Listings of Impairments.  R. 20, Findings 2, 3.  Indeed, the ALJ found that these

two disorders did not even constitute a "severe" impairment.  R. 20, Finding 4.

Parker requested a review of the ALJ's decision on October 21, 2003.  R. 160.  After

considering additional evidence submitted by Parker,[1] the Appeals Council denied review on April

2, 2004.  On June 3, 2004, Parker timely appealed the Appeals Council's decision to deny review

to the United States District Court.  Docket No. 1.  On November 1, 2004, Parker filed a

memorandum of law in support of her appeal of the denial of review.  Docket No. 14.  On

December 28, 2004, the Commissioner filed a memorandum in support of her decision that Joanne

was not disabled.  Docket No. 16.  The appeal is ripe for determination.

## II.   THE PARTIES' POSITIONS

Parker assigns two primary errors to the Commissioner.  First, she complains that the ALJ

failed in his duty to develop the record by failing to order a consultative exam to more fully assess

---

[1] The Appeals Council indicated that it had considered Parker's request for review, a duplicate request for review, and a "Notice of 2-day school suspension, dated October 8, 2003," but no additional medical evidence.  R. 8.

Joanne's mental and behavioral problems.  Docket 14 at 6.  Second, she argues that the ALJ's

decision was not supported by substantial evidence because a great deal of evidence contradicts the

ALJ's findings that Joanne had no more than minimal limitations in the domains of acquiring and

using information, attending and completing tasks, and interacting and relating to others.  Docket

14 at 7 - 9.

The Commissioner counters that the record does contain sufficient documentary evidence,

such as medical and school records, to permit the ALJ to make an informed decision.  Docket 16 at

3 - 7.  The Commissioner also argues that the ALJ's decision was supported by substantial

evidence, and that Joanne's academic and behavioral problems substantially improved when she

took her medication as prescribed.  Docket 16 at 7 - 10.

### III.    THE STANDARD OF REVIEW

### A.    Affirmance

The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v.

Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th

Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord, Edwards v. Sullivan*, 937

F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court

will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if

the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

### B.      Reversal and Remand

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42. U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner and enter an order awarding disability benefits where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of  42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences.

-4-

*Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.  *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow him to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).  On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).  After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new

evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).

To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at 1095.  With a sentence-six remand, the parties must return to the district court after remand to file modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings.[2]  *Id.*

## IV.    THE LAW

### A.    The Old "Comparable Severity" Standard for Childhood Disability

Before 1990, a child was "disabled" if he suffered from any medically determinable physical or mental impairment of "comparable severity" to an impairment that would prevent an

---

[2]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six.  *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction.  *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court.  *Id.*

adult from working.  42 U.S.C. § 1382c (a)(3)(1982).  On February 20, 1990, the United States

Supreme Court decided *Sullivan v. Zebley*, 493 U.S. 521 (1990).  The Supreme Court determined

that the Commissioner's childhood SSI disability regulations and rulings had failed to implement

the SSI statute enacted by Congress.  The regulations were manifestly contrary to the statute, and

exceeded the Commissioner's statutory authority.  493 U.S. at 541.

The Supreme Court  rejected the Commissioner's argument that a functional analysis of

childhood disability was not feasible, and that a "listings-only" approach to childhood disability

was the only practicable way to determine whether a child's impairment was "comparable."  493

U.S. at 539 - 40.  After *Zebley*, the Commissioner "substantially liberalized" the childhood SSI

eligibility regulations to provide for an individualized functional analysis.  *See* S. REP. NO. 104-96,

104th Cong., 1st Sess. 1995 (available on Westlaw at 1995 WL 351655).

### B.    The New "Functional Limitations" Standard for Childhood Disability

#### 1.    The New Act and Statute

On August 22, 1996, the President signed into law the Personal Responsibility and Work

Opportunity Reconciliation Act, Pub.L. No. 104-193, 110 Stat. 2105.  The Act amended the

substantive standard for evaluating children's disability claims to read as follows:

> An individual under the age of 18 shall be considered disabled for the purposes of
> this subchapter if that individual has a medically determinable physical or mental
> impairment, **which results in marked and severe functional limitations**, and
> which can be expected to result in death or which has lasted or can be expected to
> last for a continuous period of not less than 12 months.

 42 U.S.C. § 1382c (a)(3)(C)(codification of the Act)(emphasis supplied).  A "physical or mental

impairment" is "an impairment that results from anatomical, physiological, or psychological

-7-

abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c (a)(3)(D). The statute does not define "marked and severe functional limitations."

In determining the severity of impairments, the Commissioner must consider the combined effect and combined impact of all of the individual's impairments. 42 U.S.C. § 1382c (a)(3)(G). In making any determination as to the disability of a child, the Commissioner must also make reasonable efforts to ensure an evaluation by a qualified pediatrician or other specialist in a field of medicine appropriate to the child's disability. 42 U.S.C. § 1382c (a)(3)(I). With respect to a child with mental impairments, however, Congress has specified that the Commissioner must make every reasonable effort to ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case review and any applicable RFC assessment. 42 U.S.C. § 421 (h).

### 2.    The New Regulations

Under express statutory authority, 42 U.S.C. § 405 (a), the Commissioner promulgates regulations governing eligibility for SSI benefits. 20 C.F.R. Part 416, Subpart I; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997). The new regulations are codified at 20 C.F.R. §§ 416.902; 416.906; 416.924 through 416.926a.[3]

The regulations define the statutory term "marked and severe functional limitations" for children as "a level of severity that meets or medically or functionally equals the severity of a listing in the Listing of Impairments in appendix 1 of subpart P of part 404 (the Listing)." 20

---

[3]The superseded text of all regulations appears in 20 C.F.R. following the revised text.

C.F.R. §§ 416.902; *see also* 416.906; 416.924 through 416.926a.[4]  The regulations set forth the

steps now used in determining disability for children.  20 C.F.R. § 416.924 (effective April 14,

1997):

> We follow a set order to determine whether you are disabled.  If you are doing
> substantial gainful activity, we will determine that you are not disabled and not
> review your claim further.  If you are not doing substantial gainful activity, we will
> consider your physical or mental impairment(s) first to see if you have an
> impairment or combination of impairments that is severe.  If your impairment(s) is
> not severe, we will determine that you are not disabled and not review your claim
> further.  If your impairment(s) is severe, we will review your claim further to see if
> you have an impairment(s) that meets, medically equals, or functionally equals in
> severity any impairment that is listed in appendix 1 of subpart P of part 404 of this
> chapter.  If you have such an impairment(s), and it meets the duration requirement,
> we will find that you are disabled.  If you do not have such an impairment(s), or if it
> does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924 (a).

Individualized functional assessments for children have been eliminated.  *See* Pub. L. 104-

193, 1996 H.R. 3734, 110 Stat. 2105, 2189;  20 C.F.R. §§ 416.924d and 416.924e (discontinued).

The Commissioner now applies a three-part test in determining a child's disability.  The first

determination is whether the child is working and performing substantial gainful activity.  20

C.F.R. § 416.924 (b).  If the child is not working, the Commissioner determines whether the child

suffers from a severe impairment or combination of impairments.  20 C.F.R. § 416.924 (c).  If the

child suffers from a severe impairment or combination of impairments, the Commissioner then

determines whether the child's impairments meet, medically equal, or functionally equal an

impairment listed under Appendix I to Subpart P of Part 404.  20 C.F.R. § 416.924 (d).  The

---

[4]Part B provides medical criteria applicable to children in those instances in which Part A does not give
appropriate consideration to the particular disease process in childhood.  *See* Parts A and B, Part 404, Subpart P, App.
1.

Commissioner evaluates age, functioning, and other factors in determining whether a child meets a listing.  20 C.F.R. §§ 416.924a - 416.924c.  Provisions for medical equivalence are established in 20 C.F.R. § 416.926.

Provisions for functional equivalence are established in 20 C.F.R. § 416.926a.  Stated generally, to functionally equal a listed impairment, a child must demonstrate one "extreme" limitation in one area of functioning, or show "marked" limitation in two areas of functioning.  20 C.F.R. § 416.926a (b). There are six areas of functioning to be considered:  cognition / communication ability;  motor ability;  social ability;  responsiveness to stimuli (birth to age one only);  personal ability (age three to age eighteen only);  and concentration, persistence, or pace (age three to age eighteen only).  20 C.F.R. § 416.926a (c)(4).

### C.    The Evaluation of Mental Disorders

The structure of the mental disorders listings for children under age 19 parallel the structure of the mental disorders listings for adults, but it is modified to reflect the presentation of mental disorders in children. 20 C.F.R. Pt. 404, Subpt. P, App. 1.  The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation applicable to children.  The listing for mental disorders in children are arranged in eleven diagnostic categories, including attention deficit hyperactivity disorder (112.11).  20 C.F.R. Pt. 404, Subpt. P, App. 1.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.

-10-

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (motor function, cognitive/communicative function, social function; personal function, and concentration, persistence, or pace).  20 C.F.R. Pt.404, Subpt. P, App. 1.  In most functional areas, there are two alternative methods of documenting the required level of severity: 1.) use of standardized tests alone, where appropriate test instruments are available; and 2.) use of other medical findings.  *Id.*  The use of standardized tests is the preferred method of documentation if such tests are available.  *Id.*

A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the child's motor, personal,  social, cognitive/communicative functioning, and concentration, persistence and pace.  This information

-11-

can be provided by programs such as community mental health centers, day care centers, and

family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P,

App. 1.  In some cases, descriptions of the child's activities of daily living or social functioning

given by individuals or treating sources may be insufficiently detailed and/or may be in conflict

with the clinical picture otherwise observed or described in the examinations or reports.  It is

necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper

understanding of the child's functional restrictions.

A child's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt.

P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely,

rather poor.  Proper evaluation of the impairment must take any variations in level of functioning

into account in arriving at a determination of impairment severity over time.  20 C.F.R. Pt. 404,

Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a sufficiently long

period prior to the date of adjudication in order to establish the individual's impairment severity.

20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment notes, hospital

discharge summaries, and work evaluation or rehabilitation progress notes if these are available.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in children who

have long histories of repeated hospitalizations or prolonged outpatient care with supportive

therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Children with chronic psychotic

disorders commonly have their lives structured in such a way as to minimize stress and reduce

their signs and symptoms.  Such children may be much more impaired for work than their signs

and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single

examination may not adequately describe these children's sustained ability to function.  It is,

therefore, vital to review all pertinent information relative to the child's condition, especially at

times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to obtain

adequate descriptive information from all sources which have treated the child either currently, or

in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms

and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may

control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment

may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt.

404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic

medications, particular attention must be focused on the functional restrictions which may persist.

These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R.

Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that a child's impairments are subject to temporary

remission.  In assessing whether medical improvement has occurred in children with this type of

impairment, the ALJ will consider the longitudinal history of the impairments, including the

occurrence of prior remission, and prospects for future worsening.  Improvement in such

impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R.

§ 404.1594 (iv).

The Listing for Attention Deficit Hyperactivity Disorder, 20 C.F.R. § Pt. 404, Subpt. P.

App. 1, § 112.11, requires:

    A.    Medically documented findings of all three of the following:

        1.    Marked inattention; and
        2.    Marked impulsiveness; and
        3.    Marked hyperactivity;

AND

    B.    . . . for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age group criteria in paragraph B2 of 112.02.

20 C.F.R. Pt. 404, Subpt. P. App.1, § 112.11.   For children (age 3 to attainment of age 18),

Paragraph B2 of 112.02 requires at least two of the following:

    a.    Marked impairment in age-appropriate cognitive/communicative function, documented by medical findings (including consideration of historical and other information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized psychological tests, or for children under age 6, by appropriate tests of language and communication; or

    b.    Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, the results of appropriate standardized tests; or

    c.    Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals who have knowledge of the child, when such information is needed and available) and including, if necessary, appropriate standardized tests; or

    d.    Deficiencies of concentration, persistence, or pace resulting in frequent failure to complete tasks in a timely manner.

20 C.F.R. Pt. 404, Subpt. P,  App. 1, § 112.02 B. 2.

### E.        Treating Physicians

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise.  *See Lewis v.* Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v. Commissioner of Social Security*,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.)

consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

## D. **Developing the Record**

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not

waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to

a special duty. *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v.*

*Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to

"scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and

to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances

are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

### E.       Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's

medical sources do not give sufficient medical evidence about an impairment to determine

whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143,

146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required

to order a consultative examination unless the record establishes that such an examination is

necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206,

1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order

such an evaluation may be reversible error).  Under the regulations, however, the ALJ may

determine that a consultative examination or other medical tests are necessary.  20 C.F.R. §

416.917 (1998).

### F.       Credibility

Where an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific

and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529,

1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing

court will not disturb a clearly articulated credibility finding with substantial supporting evidence

in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*,

786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for

discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67

F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when

credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349,

1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility

determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such

testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote*

*v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983)

(although no explicit finding as to credibility is required, the implication must be obvious to the

reviewing court).

**V.      APPLICATION AND ANALYSIS**

     **A.      The Facts**

During the 1999-2000 school year, Joanne's teacher noted that she needed improvement in

practicing self control and considering others but had satisfactory performance in following rules,

cooperating with groups, listening attentively, following directions, working independently,

planning and organizing work, completing classwork, and completing homework. R. 107. She

was also reading below grade level, R. 109, but received "A" grades in reading, language, mathematics, science, art, music, and physical education, R. 107.

On January 24, 2001, Lakeside Alternatives — a community mental health center, R. 122 — performed an intake exam on Joanne. R. 125 - 30. She reported sleep disturbances, poor concentration, a history of verbal aggression, frequent fighting at school and at home, poor impulse control and poor coping skills. R. 125. It was reported that she had poor academic performance. R. 125. She presented in a very inattentive manner. R. 125. Joanne's exam revealed impaired recent memory, poor concentration, and poor social skills. R. 128. She was restless in the office, had poor eye contact and soft speech. R. 128. The examiner rated her as a "moderate risk" on the Bengelsdorf Crisis Triage Rating Scale. Her score indicated significant risk and that she might require inpatient admission. R. 127. The diagnosis was ADHD, oppositional defiant disorder, and history of asthma. R. 129. Her GAF was 48 (serious symptoms or impairment).[5] R. 129.

Maximo Perez, M.D. of the Lakeside Alternatives Children's Outpatient Department completed a psychodiagnostic examination of Joanne on February 15, 2001. He diagnosed ADHD and a history of asthma. He noted that her level of psychosocial stressors was moderate and her

---

[5]The Global Assessment of Functioning ["GAF"] Scale in the DIAGNOSTIC AND STATISTICAL MANUAL describes an individual's overall psychological, social, and occupational functioning as a result of mental illness, without including any impaired functioning due to physical or environmental limitations. DSM-IV at 32. A GAF code of 41 - 50 indicates serious symptoms, or serious impairment in social or occupational functioning (e.g., no friends, unable to keep a job). DSM-IV at 32.

GAF was 40.[6]  R. 123.  Dr. Perez prescribed Dextrostat three times a day and Clonidine at

bedtime.  R. 124.

On April 27, 2001, Joanne returned to Lakeside Alternatives for a followup and her GAF

was assessed at 45 (serious symptoms or impairment).  R. 121.  The examiner described Joanne as

alert and cooperative, while Joanne reported that she was doing well and getting good sleep while

on her medications.  R. 121.

On a "Teacher/Counselor Questionnaire" dated May 21, 2001, her third-grade teacher

noted that Joanne had been in trouble twice during the school year for her behavior.  R. 86.  The

teacher also described Joanne as a "very bright and hardworking student" and "in the top 5

students in my class".  R. 86.  The teacher further wrote that Joanne satisfactorily stayed on task,

completed assignments during the allotted time, and had not suffered a sudden worsening of her

functioning or behavior, though she had been tardy almost every day.  R. 86 - 88.

Joanne returned to Lakeside Alternatives for followup on August 7, 2001, and her GAF

was assessed at 50 (serious symptoms or impairment).  R. 120.  Joanne reported good appetite and

sleep while on her medications, and the examiner described her as alert and cooperative.  R. 120.

Joanne went to Lakeside Alternatives for followup again on October 3, 2001, and her GAF was

assessed at 55 (moderate symptoms).[7]  R. 119.  Just as on her previous visit, Joanne reported

generally good appetite and sleep, and her examiner described her as alert and cooperative.  R.

---

[6]A GAF code of 31 to 40 is worse — the individual has some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood.  DSM-IV at 32.

[7]A GAF code of 51 - 60 indicates moderate symptoms, or moderate difficulty in social or occupational functioning (e.g., few friends, conflicts with peers or co-workers).  DSM-IV at 32.

119.  During another followup visit to Lakeside Alternatives on February 1, 2002, Parker reported that Joanne's behavior in school was "OK" and her grades were fairly good, although she had been out of her medications for two or three months.  R. 155.  Parker reported that Joanne had trouble following directions at home and difficulty sleeping, and that she fought with her brother.  R. 155.  The examiner assessed Joanne's GAF at 50 (serious symptoms or impairment).  Parker's prescriptions for Adderall and Clonidine were discontinued, and she was prescribed Resperidol.  R.155.

Joanne's FCAT reading achievement level score of November 21, 2002 — a 2 on a scale of 1 - 5 — was the same as her score of the previous year, and needed improvement.  Her FCAT mathematics achievement score — a 1 on the same 1 - 5 scale — was lower than her score of the previous year.  R. 105.

On April 16, 2003, Joanne's principal notified Parker that her daughter needed an Academic Improvement Plan and was being considered for retention.  R. 99.  However, Joanne was promoted to the fifth grade for the 2003 - 04 school year.  R. 100.  Joanne was referred for discipline problems on April 21, 2003.  The referral noted that she had been disruptive in class since April 8, 2003, and her disruptive behavior was continuing.  Joanne received detention for her behavior.  R. 103.  On her Spring 2003 FCAT Reading Comprehension Exam, Joanne received three out of a possible 10 points.  R. 101.

The  year-end report from Wheatley Elementary for Joanne's fourth-grade year — 2002 - 03 — noted that Joanne read at a third-grade level.  She was rated as showing inadequate effort in

completing homework as assigned for one reporting period, but she was rated as showing satisfactory effort in the other two periods.  She received A and B grades in reading.  R. 104.

Joanne underwent an intake screening on July 3, 2003 at Lakeside Alternatives.  Parker reported that her daughter had been off her medications for "a couple years" and had a history, while off the medications, of stating that she wished that she were dead.  R. 148.  She had headaches and stomach aches.  R. 149.  It was reported Joanne took a handful of her brother's pills to calm herself down.  R. 150.  On the Bengelsdorf Crisis Triage Rating Scale, Joanne scored in the "moderate risk" range, indicating significant risk and that she might require inpatient admission.  R. 150.  The examiner noted that Joanne had poor attention span and concentration, as well as poor impulse control, insight and judgment.  R. 151.  Her behavior was restless, frustrated and she reported sleep disturbances.  R. 151.  She was diagnosed with ADHD, oppositional defiant disorder and had a GAF of 41 (serious symptoms or impairment).  R. 152.

On July 28, 2003, Lakeside Alternative performed a psychosocial assessment on Joanne. Parker reported that Joanne "becomes dramatic [and] says she wishes she had not been born." Joanne denied suicidal intentions or plans.  Parker reported that Joanne had been disobedient and had said she wanted to hurt herself.  Parker also said that Joanne had fist fights with her sister, with the most recent such fight occurring approximately four months earlier.  Joanne had poor attention span and concentration, though her mother said her attention and concentration were good so long as she was interested in the topic.  Joanne also had poor impulse control, insight and judgment.  Joanne was restless/fidgety, impatient, irritable, emotionally immature, suspicious/mistrusting of others and had difficulty falling asleep.

The examiner noted that Joanne said she used to be able to get along with people, but said that "now I have some enemies, they don't know it yet." Joanne also lied and had angry outbursts. The problems that impacted her school performance were her inability to pay attention, to focus, and to complete a request after being asked once. The examiner noted that Joanne had been suspended in second grade and had been in detention once the current year. She was diagnosed with ADHD, oppositional defiant disorder and asthma. She had a history of fighting, suspensions and detentions. R. 141 - 46. She was prescribed Ritalin and Trazodone. R. 140. On a followup visit to Lakeside Alternatives on August 20, 2003, Parker reported that Joanne still had problems with sleep but that the Trazodone had given her problems.[8] R. 137.

### B.   The Analysis

Parker's principal contention is that the ALJ erred by failing to fully develop the record. Docket 14 at 5. Parker was not represented by counsel in the earlier proceedings. Because of this, her current attorney contends that the ALJ's normal obligation to develop a full and fair record rose to a "special duty," requiring him to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Docket 14 at 5 (citing *Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). However, this special duty arises only when a claimant *who has not waived her right to counsel* represents herself in a hearing. *Schweiker* at 829. After an inquiry at the hearing, R. 164 - 66, the ALJ found that Parker knowingly and intelligently made such a waiver.

---

[8] Although the examiner recorded additional information about Joanne's status at the time of this visit, it is illegible. R. 137.

R. 12.  Parker does not argue that the ALJ's finding as to her waiver was incorrect.  As such, no

special duty arose in this case.

Even absent a special duty, the ALJ was obliged to fully develop the record.  With respect

to a child with mental impairments, the ALJ was required to make every reasonable effort to

ensure that a qualified psychiatrist or psychologist has completed the medical portion of the case

review and any applicable RFC assessment.  42 U.S.C. § 421 (h);  42 U.S.C. § 1382c (a)(3)(I).

The ALJ is required to order additional medical exams when a claimant's medical sources do not

give sufficient medical evidence about an impairment to render an informed decision as to whether

the claimant is disabled.  20 C.F.R. § 416.917.

Parker argues that the ALJ should have ordered a consultative exam to permit him to make

an informed decision regarding the extent of Joanne's mental and behavioral problems.  Docket

No. 14 at 6.  In support of this argument, she lists nearly all of the evidence of mental and

behavioral problems found in the record:  the medical records describing Joanne's history of

defiance, disruptive behavior, and fighting [R. 103, 125, 146]; evidence that Joanne was

inattentive and had poor academic performance [R. 125]; evidence of Joanne's history of verbal

aggression, poor impulse control, poor coping skills and poor social skills [R. 127 - 28]; the ratings

of "moderate risk" on the Bengelsdorf Crisis Triage Rating Scale, indicating that Joanne posed a

significant risk and might require inpatient admission [R. 127, 150]; evidence of Joanne having a

poor attention span, concentration, impulse control, insight, and judgment [R. 128, 142, 151];

Joanne's diagnoses of ADHD, oppositional disorder, and asthma [R. 123, 129, 146]; her various

GAF assessments, ranging from 40 - 55 [R. 119 - 21, 123, 129, 152]; the report that Joanne once

-24-

took a handful of her brother's pills to calm herself down [R. 150]; Joanne's report that she used to be able to get along with people but now had some enemies [R. 145]; evidence that Joanne lied and had angry outbursts [R. 145]; and a report that she had been suspended in the second grade for fighting and had been in detention once in the fourth grade [R. 145].  She also cites her own testimony that Joanne once deliberately burned her sister with a hot bowl because they had been arguing [R. 177], that Joanne liked to play with fire and her [Parker's] belief that, at some point, Joanne had burned a dark ring in the carpet [R. 181], and that Joanne and her sister once fought so strenuously that a hole was knocked in the wall of their home [R. 181 - 82].

After reciting this list, Parker argues that the list "clearly indicates that the ALJ should have developed the record more fully to determine the full extent of Joanne's mental and behavioral problems."  Docket 14 at 6.  Parker describes the records from Lakeside Alternatives as "sporadic" and "clearly not sufficient to fully develop the record regarding Joanne's mental and behavioral problems," thus requiring the ALJ to order a consultative exam before he could make an informed decision.  Docket 14 at 6.

The Commissioner responds, Docket 16 at 5, that the ALJ had a great deal of information available to him besides the information cited in Parker's list.  She points to Joanne's medical records, and argues that her mental and behavioral problems subsided after she began taking the medications prescribed by Dr. Perez, and remained under control so long as she continued to take them.  R. 119 - 24.  According to the Commissioner, the records also show that Joanne's GAF improved while she was on the medications.  R. 119 - 24.  The Commissioner also cites to Joanne's educational records, which show that after several months without her medications, she

continued to do well in school, though her behavioral problems had begun to recur.  R. 155.  Those

records also showed, as the ALJ noted, that even after she stopped taking the medications,

Joanne's teachers described her as respectful and affectionate, said she had many friends, and liked

to assume responsibility such as acting as line monitor.  R. 18.  Further, records of the 2002 - 03

school year (a period when she was off her medication) show that her work habits and social

development were in the "satisfactory" range and her grades, though not stellar, were mostly Cs or

better.  R. 102.

Although the Commissioner correctly points to some evidence supporting the ALJ's

findings regarding Joanne's behavioral and mental impairments, the ALJ should have ordered a

consultative exam and Mental RFC assessment by a child psychiatrist.  In light of Joanne's

repeatedly low GAF assessments indicating symptoms that were moderate, serious, or worse, such

an examination was necessary to render an informed decision.  In any event, error is apparent in

the ALJ's conclusion that Joanne's ADHD and oppositional defiant disorder in combination do not

even amount to a "severe" impairment.  R. 12,  Finding 4.

It is true that the educational records are contradictory, some indicating that Joanne was a

very bright, hardworking student, among the top 5 in her class, R. 86, while others indicate she

was reading below grade level, R. 104, was floundering on the FCATs, R. 105, and was in danger

of being held back a grade, R. 99.  The medical records from Lakeside are sporadic, and the two

Childhood Disability Evaluation Forms filled out in July 2001 and January 2002 by State Agency

physicians are so minimal as to be of little assistance in resolving these inconsistencies.  R. 113 -

18, 131 - 36.  In addition, it appears that several of Joanne's most serious incidents of misbehavior,

such as starting fires, did not occur at school, and were never considered by a medical

professional.

The ALJ and the Commissioner make much of the records that show Joanne's GAF and

behavioral issues improving during the period she was taking medication (i.e., through

approximately the end of 2001, R. 20), implying that any mental and behavioral problems after

2001 have no bearing on whether Joanne is disabled.  Parker testified that her physician

discontinued Joanne's medications in July 2003.  R. 148.  In any event, it is far from clear that the

medications curtailed Joanne's mental problems, and that it any "failure" to take those medications

should bar recovery by a child.  So far as the record discloses, even when she was taking her

medications, Joanne's GAF never exceeded 55.[9]  R. 119.  A consultative examination is needed to

shed light on Joanne's Mental RFC, on the inconsistencies in the educational records, and on the

effect of the medication.

Parker's second argument is that the ALJ's decision was not based on substantial evidence.

Docket 14 at 7.  Specifically, she takes issue with the ALJ's conclusions that Joanne had no

limitation in the domain of acquiring and using information, had no more than slight limitations in

the domain of attending and completing tasks, and had no more than slight limitations in

interacting and relating to others.  Docket 14 at 7 - 9.  The dueling arguments on this point

resemble those raised by the parties in the preceding section.  For example, in assailing the ALJ's

conclusion regarding her ability to acquire and use information, Parker points out that Joanne read

---

[9] On the Global Assessment of Functioning Scale, a score of 55 signifies that the patient demonstrates
"[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or "[m]oderate difficulty in
social, occupational, or school functioning (e.g., few friends, conflicts with co-workers).

below grade level, performed poorly academically, had low (and, in some cases, declining) FCAT

scores, and had been identified by her fourth-grade principal as in need of an Academic

Improvement Plan and in danger of retention. Docket 14 at 7.  Such evidence, Parker states,

"clearly contradicts the ALJ's findings of no limitation in this area." Docket 14 at 7.

In response, the Commissioner points to, *inter alia*, the evidence that the ALJ cited in

reaching his conclusion on this point:

> The claimant was a straight 'A' student in the second grade and displayed above
> average effort in class.  The mother testified the claimant has problems with reading
> comprehension; yet, the claimant stated she enjoyed reading, even at home.  In
> February 2001, the mother reported the claimant was doing well academically since
> starting medications for her attention deficit disorder.  Moreover, in July 2003, the
> mother reported the claimant was earning satisfactory grades in reading and math.
>
> The claimant has been in regular classes in school with no special tutoring or any other
> accommodations, at least until currently when she entered the fifth grade in school.
> She had been given the same assignments that were given to the other students.  A
> third grade teacher described the claimant as "a very bright, hardworking student", and
> in fact, was one of the top 5 students in her third grade class.  This was despite the fact
> that the claimant had been tardy to class almost every day and had excessive absences.
>
> The claimant's FCAT scores obtained in 2001 indicated the claimant was in the third
> grade level in reading and math and in 2002 she earned scores placing her at the fourth
> grade level, commensurate with her grade level.  Fourth grade teachers' reports,
> however, indicate the claimant with a reading level of between the third grade and
> fourth grade.  The claimant's final fourth grade report card showed she had made
> excellent progress with 'A' in Mathematics and Social Studies, and average progress
> of a 'C' in Language and Science.  The Principal at Phyllis Wheatley Elementary
> School noted on May 1, 2003, the claimant was promoted to fifth grade in school and
> would be remediated with intensive strategies according to an Academic Improvement
> Plan.  There was no indication of memory or significant intellectual deficit on
> psychiatric examination.  Considering the foregoing, the undersigned finds the
> claimant has no limitations in the domain of Acquiring and Using Information.

R. 17 - 18 (internal record citations omitted).

The ALJ offered no explanation for relying on the foregoing evidence and not on the evidence cited by Parker.  Given the need for a consultative examination, the Court need not resolve this issue.

Upon remand, the Commissioner shall order a consultative exam and Mental RFC assessment by a child psychiatrist.  The child psychiatrist shall evaluate Joanne's Mental RFC and any other matters requested by the Commissioner.  The child psychiatrist shall take into consideration all relevant parts of Joanne's medical, educational, and behavioral history.  ALJ will take the results of the consultative exam into consideration in reaching conclusions as to the domains at issue.

## VI.    <u>CONCLUSION</u>

For the reasons stated above, the decision of the Commissioner is **REMANDED** to the Commissioner of Social Security under Sentence Four of 42 U.S.C. § 405 (g).  The Clerk shall enter a judgment and close the case.

**DONE AND ORDERED** this 17th day of August, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia        30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL             33602

The Honorable Apolo Garcia
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
3505 Lake Lynda Drive
Orlando, FL 32817